[Civ. No. 28967. First Dist., Div. One. June 8, 1972.]

OAKLAND UNIFIED SCHOOL DISTRICT OF
ALAMEDA COUNTY, Plaintiff and Respondent, v.
EILEEN BARBARA ROTH OLICKER, Defendant and Appellant.

COUNSEL

Levy & Van Bourg, Victor J. Van Bourg and Stewart Weinberg for Defendant and Appellant.

Richard J. Moore, County Counsel, and William R. Johnston, Deputy County Counsel, for Plaintiff and Respondent.

OPINION

**MOLINARI, P. J.**—Defendant teacher appeals from a judgment determining that she was guilty of evident unfitness for service for plaintiff school district justifying her dismissal as a probationary, certificated employee of plaintiff.

### The Facts

On December 12, 1968, verified written charges were filed with plaintiff's Board of Education (hereinafter the "Board") charging that there existed cause for the dismissal of defendant under section 13403 of the Education Code[1] on the ground of immoral conduct and evident unfitness for service. Subdivision (a) of section 13403 provides that a permanent employee shall be dismissed for "Immoral . . . conduct," and subdivision (e) of said section provides for such dismissal for "Evident unfitness for service." With particular regard to probationary employees section 13442 provides that "Governing boards of school districts shall dismiss probationary employees during the school year for cause only, as in the case of permanent employees." (See *Lunderville* v. *Emery Unified Sch. Dist.,* 262 Cal.App.2d 459, 463 [68 Cal.Rptr. 768].)

The acts, specific instances and omissions upon which the foregoing charges were based, were stated to be the reproduction and distribution to her pupils of certain materials prepared by them as lesson assignments. These materials, copies of which were attached as exhibits to said charges, consisted of writings containing vulgar references to the male and female sexual organs and the sexual act.

Pursuant to a resolution adopted as provided in section 13404, the Board on December 18, 1968, gave notice to defendant of its intention to dismiss defendant at the expiration of 30 days from the date of the service

---

[1]Unless otherwise indicated, all statutory references are to the Education Code.

of the notice, unless she demanded a hearing as provided by the applicable statutes. Defendant made a timely demand for a hearing. Upon such demand the Board elected, as was then provided by section 13412, to file a complaint in the superior court setting forth the charges against defendant and asking that the court inquire into the charges and determine whether or not the charges were true, and if true, whether they constituted sufficient grounds for the dismissal of defendant.[2]

The trial court, following a hearing, found that defendant did cause the material in question to be reproduced and distributed to her pupils and concluded that such distribution did not constitute immoral conduct but that it did constitute "evident unfitness for service." The subsequent judgment recited that defendant was unfit for service, that such unfitness was evident and a sufficient ground for dismissal, and that plaintiff could dismiss defendant. Defendant appeals from the judgment.[3]

At the hearing below the parties stipulated that defendant caused the material in question to be reproduced and distributed to her pupils. Plaintiff did not introduce any evidence other than copies of the charges filed with the Board dismissing defendant. Defendant took the stand and testified. She also called three witnesses. Neither defendant nor the witnesses called on her behalf were cross-examined.

Defendant testified, essentially, as follows: She was graduated from Queens College in 1965 with a Bachelor of Arts degree and then took graduate courses at Pennsylvania State University. She holds teaching certificates issued by the State of New York. Prior to her employment by defendant she taught for two years in a Catholic elementary school in Ohio and for one year taught speed reading and study skills in colleges for a private company. While employed for the private company she also taught courses at Ohio Wesleyan University in a program for economically disadvantaged children with college potential, most of whom were Negroes.

Defendant was hired by plaintiff in September 1968 to teach reading and social studies in the eighth grade at Roosevelt Junior High School. She was hired for the purpose of teaching in a special program designed for students who were poor readers in order to remedy this deficiency. Under this program there were only 15 children in each class. The students in these classes were from 13 to 14 years of age, and from the lower and

---

[2]Section 13412 was superseded in 1971 by section 13413 which now provides for a hearing under the Administrative Procedure Act of the Government Code (commencing with § 11500) rather than a proceeding in the superior court.

[3]Section 13440, in effect at the time the instant proceeding was appealed, provided that plaintiff could appeal from the judgment. This section was repealed in 1971.

lower middle economic classes. Defendant taught four classes each day and the same group of students were in her class twice each day. A standardized reading test showed that the students in defendant's classes read at a level of children in the first through the third grade.

The students in defendant's classes were difficult to teach and to discipline. Some were hostile to and others had a negative attitude towards their studies. Many had an extremely low level of emotional stability. The students often used vulgar language towards each other; there was a great deal of hostility between groups in the classes, and often there were fights among the students.

In order to overcome the hostilities the students had towards their lessons and towards each other, and to obviate the necessity of effecting discipline by the principal but to achieve it in the classroom, defendant sought to give the students assignments that were not only more pleasing to them but were also designed to bring the students together. Thus she was able to get them to discuss and prepare ethnic foods and to participate in opinion polls.

Defendant had spoken with another teacher who had told her about an experiment which involved telling the students that they could write about anything they wanted and that they need not be concerned about grammar, spelling, and punctuation. Defendant tried this lesson plan with her class. Most of the stories which were turned in were similar to those appended to the charge. They dealt with sex and drugs. Defendant stated that she was surprised by this. She took the papers home and wrote comments on them but she never returned them to the students. She also stated she was surprised at the interest the class had shown in being permitted to write about anything they wanted, because, usually, when they were instructed to write a composition on a specific subject they would refuse.

Defendant had read a book entitled "Thirty-Six Children" by Herbert Kohl advocating that children be allowed to determine the direction of their writing. She also had read a book entitled "Teaching About Minorities in Classroom Situations." This book, published by the New York Board of Education, suggested that the way to handle obscenity was to bring it out into the open and to discuss its communicative value.[4]

Following the reading of these books she again told her class that they could write on a subject of their own choosing and that if they wished they

---

[4]The book was sent to defendant by her father who is a social studies teacher in New York.

could write directly on a ditto sheet and that she would make copies of their work for purposes of discussion and to demonstrate the importance of spelling in order to communicate.

Adverting to the instant material, defendant stated that when she received it she weighed the choice between telling the students that the material was rejected because it was vulgar or, in the interest of reaching them, to tell them that what they wrote was not evil. She elected to follow the latter because she felt that, as a teaching technique, this was the better approach under the circumstances.[5]

Defendant testified that she was going to discuss the material with the students in order to demonstrate that the stories were not interesting nor identifiable with anyone they knew and to show them that, because of the poor spelling, what they were attempting to communicate was not understandable to the reader.

Defendant duplicated the students' work and brought it to class the next day. Defendant had intended to say that anyone who wanted a copy could have one; anyone who did not want a copy did not have to take one. The material was to have been returned to defendant at the end of class and destroyed. Before the class began a fight which had been going on in the hall spilled over into defendant's classroom. The principal came in and stated he was going to inflict certain discipline on the students who were not members of the class. Among these was a boy who was visiting with some of defendant's students.

As a result of the incident, defendant's class turned on defendant and

---

[5]Defendant testified: "I could either say 'This is vulgar language, it's dirty writing, it's bad, you are bad, your writing is no good, I am going to throw it out and I never want to see anything like that again.' I could say that and I think that would be the ordinary teacher's response and probably the response that Dr. Stolte would have wanted me to give but I was in a classroom day after day after day and fighting a fight that I was losing and caring that I was losing it, and so I felt, 'Well, I have to do something. I have to somehow reach these kids, because otherwise they are going to walk out at the end of twelfth grade with their high school diploma in their hand and they are not going to be able to fill in a job application and they are going to go through life in poverty and misery and in rioting because they can't succeed.' And so I said, 'I am willing to take a risk. I am going to say to these kids "What you did is not evil. You are not evil. The stuff you wrote is not evil, and to prove to you that I mean it I am going to mimeograph it and I am going to copy it over so I can mimeograph it and I am going to give it back and you are going to read and write it." ' And that was what was in my mind when I did it.

"Now, whether I made a mistake, certainly in the context of what has happened, certainly a tactical error, but as far as a teaching technique I felt for one day I had a classroom of kids that were reading and writing as hard as they could and as fast as they could where for four months I had a class of kids who said 'No, I won't read and I won't write and let's see you make me.' "

said they were going to "turn [her] in." Defendant told the class that they did not have to "turn [her] in" because she was going to do it herself. Defendant told them that she was leaving as soon as the class was over. One of the girls in the class said that they would not turn defendant in if she would intercede for their friend who had been taken to the principal's office. Defendant called-the principal's office in order to explain the presence of the boy in the class at the time of the fight. Defendant, however, told the class that she still intended to "turn [herself] in." The students then rushed up to the desk and tore up all the material and pleaded with defendant not to "turn [herself] in."

About a month later one of defendant's boy students, who had been disciplined by defendant, left a copy of the subject material, which he had apparently retained, in the school principal's mail box. The principal called defendant into his office and she explained to him her lesson plan. The principal said that he did not agree with the technique and that he didn't want it to happen again, but stated that she should not worry about it because he considered her a good teacher. Later, the principal told defendant he was obliged to report the matter to the Board.

Myrtle Neal, a teacher's aide, who assisted defendant with her morning classes, was the next witness. She testified that in her opinion defendant was not immoral and that some of the students made frequent use of vulgar language while in the classroom.

Defendant then called Kenneth S. Lane. Lane is the supervisor of secondary education at the University of California at Berkeley. He supervises candidates for teaching credentials during their year of student teaching. He had held this position for five and one-half years. He testified that in his opinion defendant was not unfit to teach and that she had done the type of things which he would like to see a beginning teacher try. Lane's only criticism was the failure of plaintiff to offer defendant any support.

When questioned as to the basis for his opinion, Lane replied that much had been written along the lines of the Kohl book. He stated that when the Kohl book first appeared in the New York Review of Books there was a great demand for it. A copy of the book had been distributed to every member of the National Council of Teachers of English. Lane stated that disciplinary problems can be dealt with in two ways. The teacher may resort to sheer force. This approach has been failing in most schools. In the alternative, the teacher may attempt to find something which the class can work on as a unit. The writing exercise in question is apparently the only thing which worked for defendant.

Lane stated that the students' writings were what he would expect to receive in the junior high schools in west and east Oakland, and in other areas as well. He stated that students use vulgar language all the time. He concluded by stating that if he had been defendant's employer he would have helped her to deal with the difficulties which she faced with her class and that he would continue her as a teacher.

Defendant's last witness was Miles Myers. Myers had been an English teacher for 12 years. He also had been a supervisor at the University of California and had taught at the university's demonstration school and in the "upward bound program." For the last eight years, Myers had been teaching in Oakland. He was to resume teaching in Oakland in the fall. He stated that his responses would be the same as Lane's. He expressed the opinion that defendant would not be in trouble if she had been a disciplinarian and had not worried about reading and writing. He also stated that the use of vulgar language and an emphasis on sex was not uncommon in the Oakland schools.

At the time the instant dismissal proceedings were commenced defendant had been teaching for plaintiff for about three and one-half months.

### Contention

Defendant contends that the conduct upon which her dismissal is predicated does not demonstrate "evident unfitness for service"; that her right to academic freedom has been violated; and that she has been deprived of due process. She also contends that the trial court erred in awarding plaintiff its costs.

### Scope of Review

The hearing before the superior court was clearly one which called for an ordinary decision of the superior court and thus was one in which the trial court was exercising its independent judgment on the evidence. Accordingly, the question before this court turns upon whether the evidence reveals substantial support, contradicted or uncontradicted, for the trial court's conclusion. (*Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308 [196 P.2d 20]; *Yakov* v. *Board of Medical Examiners*, 68 Cal.2d 67, 72 [64 Cal.Rptr. 785, 435 P.2d 553]; see *Board of Trustees* v. *Stubblefield*, 16 Cal.App.3d 820, 824 [94 Cal.Rptr. 318].) Our function, therefore, is to decide whether credible, competent evidence supports the trial court's judgment. (*Yakov* v. *Board of Medical Examiners, supra*, at p. 69; *Morrison* v. *State Board of Education*, 1 Cal.3d 214, 238 [82 Cal.Rptr. 175, 461 P.2d 375].) However, where the facts are undisputed the ultimate

conclusion to be drawn from such facts is a question of law for an appellate court. (*Morrison* v. *State Board of Education, supra; Yakov* v. *Board of Medical Examiners, supra,* at p. 74, fn. 7; *San Diego T. & S. Bank* v. *San Diego,* 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416].)

### *"Evident Unfitness for Service"*

Defendant's dismissal is predicated solely on the ground of "evident unfitness for service." This is one of the causes specified in sections 13403 and 13442 for the dismissal of a probationary employee. Although a number of cases have considered this ground for dismissal, only one case has attempted to define the phrase "evident unfitness for service."

In *Palo Verde etc. Sch. Dist.* v. *Hensey,* 9 Cal.App.3d 967, 972 [88 Cal.Rptr. 570], the reviewing court accepted the dictionary definitions of "evident" as meaning " 'Clear to the vision and understanding' " and the dictionary definition of "unfit" as " 'not fit; not adapted to a purpose, unsuitable; incapable; incompetent; and physically or mentally unsound.' " (See Webster's Collegiate Dict. (7th ed. 1970) p. 288.) The court also accepted the following definition of "unfit" as defined in California Words, Phrases and Maxims, page 440: " 'unsuitable, incompetent and not adapted for a particular use of service.' " (At p. 972.) In *Hensey,* the teacher was charged with evident unfitness for service and immoral conduct and the appellate court upheld the trial court's determination that the charges were true and constituted sufficient grounds for dismissal upon the basis that the incidents of the teacher's conduct,[6] taken in the aggregate, served as a substantial basis for the trial court's determination. Although the reviewing court was reluctant to find that any one incident in and of itself constituted unfitness, it concluded that each incident was evidence of unfitness, and that taken in the aggregate they justified a finding that the defendant was "evidently unfit" to teach.

In other cases involving the charge of "evident unfitness" the reviewing courts found it unnecessary to define the phrase since the charge was combined with another charge upon which the sustaining of a dismissal was focussed. (See *Board of Education* v. *Swan,* 41 Cal.2d 546, 550 [261 P.2d 261] [unprofessional conduct, evident unfitness for service, and persistent violation of or a refusal to obey school laws and regulations]; *Board of*

---

[6]In *Hensey,* the evidence disclosed that the teacher removed from his classroom a school public address system loudspeaker that served as an announcement system for the college, as a fire alarm, and as the method of signalling the beginning and the end of the class period, and that on several occasions he used vulgar language and made vulgar gestures during class.

*Education* v. *Weiland,* 179 Cal.App.2d 808, 810 [4 Cal.Rptr. 286] [immoral conduct, unprofessional conduct, dishonesty and evident unfitness for service]; *Board of Trustees* v. *Hartman,* 246 Cal.App.2d 756, 759 [55 Cal.Rptr. 144] [immoral conduct and evident unfitness for service]; *Board of Trustees* v. *Stubblefield, supra,* 16 Cal.App.3d 820, 822 [immoral conduct and evident unfitness for service].)

It has been noted, moreover, that each of the causes for removal stated in the code substantially overlap one another, i.e., the acts or omissions charged may be included in one or more causes for removal, and hence that the interpretation given to the terms "immoral conduct" and "unprofessional conduct" cover much the same conduct as "evident unfitness for service." (See *Board of Education* v. *Swan, supra,* 41 Cal.2d 546, 551; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 220, fn. 9; *Board of Education* v. *Weiland, supra,* 179 Cal.App.2d 808, 812-813; *Fresno City H. S. Dist.* v. *De Caristo,* 33 Cal.App.2d 666, 672 [92 P.2d 668].) We observe, further, that in *Swan,* although the court discussed only the meaning of "unprofessional conduct," it made it clear that the interpretation given such a term "is to be construed according to its common and approved usage, having regard for the context in which the Legislature used it." (At p. 553.)

 We observe, moreover, that the term "evident unfitness for service" should not be given a definite technical meaning and that a court should not arbitrarily find that it is subsumed under some set formula. (*Board of Education* v. *Swan, supra,* 41 Cal.2d 546, 551.) In applying the standard due consideration must be given to the circumstances of the case at hand. (*Board of Education* v. *Weiland, supra,* 179 Cal.App.2d 808, 811-812.)

In *Swan,* the Supreme Court observed that a particular act or omission of a teacher may constitute evident unfitness for service. (At p. 551.) Yet, in deciding whether certain conduct by a teacher constitutes conduct which warrants discipline, the inquiry by a court is whether that conduct has produced "any disruption or impairment of discipline or the teaching process . . . ." (*Board of Trustees* v. *Owens,* 206 Cal.App.2d 147, 157-158 [23 Cal.Rptr. 710]; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 222-223.) Accordingly, a permanent and probationary teacher may not be dismissed on the basis that he or she is unfit to teach unless there is a showing that the teacher's retention in the teaching profession "poses a significant danger of harm to either students, school employees, or others who might be affected by his [her] actions as a teacher." (*Morrison* v. *State Board of Education, supra,* at p. 235; see *Board of Trustees* v. *Stubblefield, supra,* 16 Cal.App.3d 820, 826.)

■ In determining whether a teacher's conduct indicates unfitness to teach, the following factors are relevant: ". . . the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or others teachers." (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 229.) The court in *Morrison* suggests that the ultimate inquiry in determining whether a teacher is fit to teach is whether the teacher's future classroom performance and overall impact on his or her students is likely to meet the standards of the school district employing the teacher. (At pp. 229-230.)

■ Adverting to the facts of the instant case we first observe that they are undisputed. Accordingly, the ultimate conclusion to be drawn from such facts is a question of law. (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 238; *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 74, fn. 7.) The determination, therefore, of whether or not defendant's conduct demonstrates "evident unfitness for service" is a question of law in the sense that it should be decided by an appellate court. (*Yakov* v. *Board of Medical Examiners, supra.*)

■ Viewing the facts pursuant to these principles we hold that, as a matter of law, defendant's conduct did not demonstrate her unfitness to teach. We perceive, moreover, that there is no credible competent evidence supporting any inference of defendant's unfitness to teach. The only basis for the trial court's conclusion is defendant's conduct in reproducing and making available to her students the subject material. This conduct per se does not warrant the inference that defendant is evidently unfit to teach. Before such an inference could be drawn it was necessary that it be shown that there was a relationship between that conduct and the functioning of defendant as a teacher.

The record before us contains no evidence that the conduct in question produced any disruption or impairment of discipline or of the teaching process, nor is there any showing by plaintiff that defendant's retention in the teaching profession poses a significant danger of harm to either students, school employees, or others who might be affected by her actions as a teacher. To the contrary, the record discloses that, aside from this

one incident, defendant was highly regarded as a teacher. As a teacher she was not unsensitive to the characteristics of the class with which she was dealing and to their educational, emotional and social handicaps. She devoted much time and energy to devising ingenious ways of reaching out to the students, of overcoming their hostility, and in involving them in the learning process.

We perceive from the uncontradicted testimony that no fault was found with defendant's teaching technique of having her students write of subjects which interested them. According to the testimony of two expert witnesses the lesson plan devised by defendant was a sound educational approach. The fault is found in the reproduction of the material which this technique produced and in making such material available to students who desired to have it. Her explanation for this course of conduct was that it was a method by which she felt she could "reach" the students in an effort to remove the emphasis on vulgarity. While the efficacy of this aspect of defendant's teaching technique may well be questioned by other teachers as well as by laymen, it is not our function to pass upon the academic merits of such a teaching technique. Rather it is our province to ascertain whether there is evidence that such a technique disrupted or impaired the discipline of defendant's students or the teaching process. As already observed, there is nothing in the record to show that the discipline in defendant's class was worsened as a result of defendant's teaching technique or that such technique interfered in any way with the teaching process.

Defendant testified that she now feels that she may have made a mistake in judgment. This is an extenuating circumstance indicating contriteness and an indication that the conduct in question will not recur. No aggravating circumstances were produced by plaintiff, nor was any evidence adduced that defendant had ignored any rules relating to teaching procedures or that she would ignore any rules in the future. There is no evidence, moreover, suggesting that defendant's future performance and overall impact on her students will not be in keeping with any standards which may be set by plaintiff. As observed in *Morrison,* "Teachers, particularly in the light of their professional expertise, will normally be able to determine what kind of conduct indicates unfitness to teach. Teachers are further protected by the fact that they cannot be disciplined merely because they made a reasonable, good faith, professional judgment in the course of their employment with which higher authorities later disagreed. [Citation.]" (1 Cal.3d at p. 233.)

It must be concluded therefore that, under the principles set forth in

*Morrison,* there is no support in the record for the trial court's conclusion that defendant's conduct constituted evident unfitness for service.

### Academic Freedom

■ Defendant argues that her conduct was a constitutionally protected expression of academic freedom. In considering this contention we observe, initially, that in construing section 13202,[7] pertaining to the revocation or suspension of teaching credentials, *Morrison* holds that such a statute, if applied in the manner as articulated in that decision, may be constitutionally applied to a teacher. (1 Cal.3d at p. 230.) Section 13202 is a statute similar in import to section 13403 with which we are here concerned. Moreover, as observed in *Swan,* "One employed in public service does not have a constitutional right to such employment and is subject to reasonable supervision and restriction by the authorized governmental body or officer to the end that proper discipline may be maintained, and that activities among the employees may not be allowed to disrupt or impair the public service. [Citations.]" (41 Cal.2d at p. 556.) Accordingly, it may not be seriously urged that one may assert that his or her academic freedom permits conduct that produces disruption or impairment of school discipline or the teaching process. In sum, there is no violation of academic freedom involved in an inquiry into whether or not the teacher's conduct is such as to constitute evident unfitness to teach.

### Due Process

■ Defendant asserts that her right to due process has been violated. The basis for this contention is unclear but it suffices to note that the constitutional analysis made in *Morrison* and discussed above with respect to academic freedom is applicable here. There can be no question that defendant has been afforded procedural due process. She was gvien notice of the charges and the proceedings against her, and she was given an opportunity to defend herself before a judicial tribunal conducted in a manner consistent with essential fairness. (See *Gray* v. *Whitmore,* 17 Cal. App.3d 1, 21 [94 Cal.Rptr. 904].) ■ With respect to substantive due process, it is equally apparent that the statutes in question are not unreasonable, arbitrary or capricious, but that they have a real and substantial relation to the object sought to be attained. (See *Gray* v. *Whitmore, supra.*) The statutes in question give a fair warning of the conduct prohibited and they provide a standard or guide against which such conduct can be uni-

---

[7]Section 13202, in pertinent part, provides that "The State Board of Education shall revoke or suspend . . . for evident unfitness for service, life diplomas, documents, or credentials . . . ."

formly judged by courts and administrative agencies. (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d 214, 230-235.)

## Costs

██ Defendant has also appealed from that portion of the judgment awarding plaintiff its costs. Section 13438 provides that "If the judgment determines that the employee may be dismissed, it shall provide that each party shall pay its own costs. If the judgment determines that the employee may not be dismissed, it shall provide that the district shall pay the costs and necessary disbursements of the employee . . . ." Since we have concluded that the trial court's determination with respect to defendant's fitness to teach was in error, the judgment must be reversed with directions to enter a judgment that defendant may not be dismissed. Such a judgment entitles defendant to her costs and necessary disbursements.

The judgment is reversed with directions to the trial court to enter a judgment determining that the charges against defendant are not true and that defendant was not subject to dismissal during the school year. Such judgment shall provide that plaintiff shall pay the costs and necessary disbursements of defendant as provided in section 13438.

**SIMS, J.**—I concur. In joining what is the majority opinion in this case in the face of the vigorous dissent of my esteemed colleague, I would point out that the trial court found on sufficient evidence that the teacher was not guilty of immoral conduct. It is improper therefore to confuse the teacher, who is attempting to cope with vulgarity and obscenity which her pupils absorbed elsewhere, with those who are responsible for the only frame of reference in which the pupils chose to express themselves. If standards of taste of future generations are to be elevated it will not be accomplished by those who seek to sweep distasteful matters under the rug, or by self-embarrassed school trustees who discharge as unfit those who would bring the problem out in the open for discussion.

We should also consider that in this world there are many cultures and many concepts of what is acceptable sexual conduct, and of what sexual conduct may be the subject of free and open discussion or publication in folklore or literature. It may be impossible to impose one strict moral code on all of society, and we may have to acquaint ourselves with, and accept, without puritanical prudery, as natural to them, the standards of others.

No one, including the teacher involved, condones her action in exposing to this material those pupils, if any, who had not already heard, if not absorbed, the language of the environment in which generations of bondage and discrimination forces them to live. Nevertheless, the fact that a month went by uneventfully after the publication of the material evidences that her fitness to teach had not been appreciably impaired by her admitted indiscretion. It cannot be said that she was free to do what she wanted without fear of discipline or restraint. She exercised the latter when she collected and destroyed the papers. Her probationary status left her subject to termination at the end of the year if her employers were dissatisfied with her bold and imaginative methods of teaching. Under the circumstances, however, the trial court was not warranted in branding her for the rest of her life as displaying "evident unfitness for service" in her chosen profession.

**ELKINGTON, J.**—I dissent.

With much delicacy and restraint my colleagues very briefly pass over the subject matter leading to this appeal. They say that defendant caused to be reproduced and distributed to her pupils certain "writings containing vulgar references to the male and female sexual organs and the sexual act."

Since our opinions are published for, and are read almost exclusively by, lawyers and judges who are presumably hardened to such matters, there seems little reason to so charitably outline the basis of the proceedings against defendant. It seems anomalous that we should shield our adult professional readers from matter which we permit a teacher to freely distribute among her grammar school pupils.

The record is not in conflict. It contains the subject writings, certain stipulations, testimony of defendant, and that of her witnesses who insisted that the disputed conduct was an acceptable grammar school teaching technique. For obvious reasons none of the children were called to testify.

Defendant taught an eighth grade class of 15 slow readers, 13 and 14 years of age. She testified that one day she told her pupils to "write anything you want to." The boys and girls started "laughing and talking." "[T]hey were enjoying it and they were interested and they were writing and they were reading each other's stuff." After a while they turned in their work to the defendant.

A girl student made this contribution which defendant "thought was very nice."

"Pussy in the World

"Pussy in the World
pussy in the world
hey every body
they pussy in the

"pussy is sweet
pussy is Free
hey aver body
pussy is Free

"And for all
taste it sametime [*sic*]"

"Pussy" is common American slang for the female sexual organ (see Webster's Third New Internat. Dict.).

The handwriting of several of the remaining papers being poor, defendant, for clarity, in her own hand copied them just as they had been written.

One of these papers read:

### "BIG BAD HAIRY DICK

"One day I saw a man with a big bad hairy dick. I ask him, Why did he call it big, bad hairy dick? He said! It all started when I fuck a girl. I said to the girl Will you let me fuck you? She said yes, I said! how big is your pussy hol? Big enough for you to get in. How big is your dick? Big enough to make you bleed. When I get finish with you. You will be bleeding from the ass and your Kotex will be so wet you can ring it out with you hand. I hope you have enough Kotex for when I get finish. We were fucking and all of a sudden he farted she said! Get out me you nasty thing! Me no fart me ass just get happier. Wee! Wee! She said with you big bad hairy dick."

Another stated:

### "Big harry Stankhold

"One day I seen a lady with a boy lieing on the ground. the Boy was lieing on top of her going up and down. When the boy went up I seen a little thing with some water come out. His little peter went in there he come

back up I saw harry blacs on her cock. I herd say, you better have a Kotex because you going bleeding a good well. That boy get off the lady and looked at his balls and said my balls is blue! The lady siad I thought I would be bleeding for a good long well. Well your Pussy is to big for my peter lady. So a man seen the lady naked an got on tope of her. He started suck on her tity the lady was pumping harder. The man said my big hairy dick is stuck in your big harry pussy. I think you are bleeding from your ass."

Yet another read:

"Big Bad Hair Cock

"One night a lady was walking down the street. A man said! Say baby get me some of that hair cock.

"Do you got someing to handle it like a big Dick! hell yeah! hol with your hair pussy.

"Yeah tell me where and I'll be there. At my pad and bring some Kotexs OK

"And wash your tits. be prepared to fuck a wile."

Defendant selected these four papers and two others for reproduction by herself and some of the children by "Ditto" machine. The next morning she gave each pupil copies of the several writings. They were to form the basis of a class discussion. Defendant explained to the class that the material "could not be kept. It would have to be returned to me at the end of the day and destroyed." Some disturbance within the school prevented the class's planned consideration of the papers. But, nevertheless, one or two of the boys became very hostile, apparently "for letting [the class] write this stuff," and they said, "We are going to turn you in." Other pupils, who said they didn't want defendant fired, "grabbed all the copies, [defendant] thought, and ripped them up and threw them away." But one of the boys "apparently preserved" his copies and "on the way up" put them "in the principal's box." Asked, "You didn't give this to [the boy] with any idea that he was going to take it out of the room at all?", defendant replied, "No. I told the children at the beginning this could not go out of the room and I did not know he had the copy." And she explained, "I knew that it was something that you obviously could not circulate in the halls because obviously it is something that is very shocking to people."

"Obscene" means that to the average person, applying contemporary standards, the predominant appeal of the matter, taken as a whole is to the

prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, which goes substantially beyond customary limits of candor in description or representation of such matters and is matter which is utterly without redeeming social importance. (See Pen. Code, § 311; *In re Giannini,* 69 Cal.2d 563 [72 Cal.Rptr. 655, 446 P.2d 535].)[1]

By this, or any, definition of the word, if the writings here in question are not obscene, then the word is a semantic fiction, wholly unrelated to any reality, and is in fact meaningless.

My colleagues find no obscenity. Comfort is given to defendant's contention that she was protected by her "academic freedom." They say—that while "one may [not] assert his or her academic freedom permits conduct that produces disruption or impairment of school discipline or the teaching process"—here there was no such "disruption or impairment of school discipline or the teaching process."

Reliance for their conclusion is placed on *Morrison* v. *State Board of Education,* 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375]. Morrison also was charged with "evident unfitness for service" as a public school teacher. He had admitted that 19 months earlier he had "engaged in a limited noncriminal physical relationship" of a homosexual nature.[2] This relationship was wholly unrelated to Morrison's employment; "No evidence was presented that [he] had ever committed any act of misconduct whatsoever while teaching." The court, in a 4 to 3 decision, found no "evident unfitness for service." But throughout its opinion the majority heavily emphasized that Morrison's conduct was in no way related to his employment as a teacher. Authority was quoted which said (p. 224): " 'The private conduct of a man, who is also a teacher, is a proper concern to those who employ him only to the extent that it mars him as a teacher . . . .' " The court stated (p. 225): "[T]he Legislature surely did not mean to endow the employing agency with the power to dismiss any employee whose personal, private conduct incurred its disapproval"; and that "We cannot believe that the Legislature intended to compel disciplinary measures against teachers who committed such peccadillos if such passing conduct did not affect students or fellow teachers. . . ."

---

[1]"We hold that obscenity is not within the area of constitutionally protected speech or press." (*Roth* v. *United States,* 354 U.S. 476, 485 [1 L.Ed.2d 1498, 1507, 77 S.Ct. 1304].)

[2]The *Morrison* court also spares the reader the details of Morrison's admitted act. It simply says (p. 218, fn. 4): "Neither sodomy (Pen. Code, § 286), oral copulation (Pen. Code, § 288a), public solicitation of lewd acts (Pen. Code, § 647, subd. (a)), loitering near public toilets (Pen. Code, § 647, subd. (d)), nor exhibitionism (Pen. Code, § 314) were involved."

The *Morrison* court then stated (p. 238): "In deciding this case we are not unmindful of the public interest in the elimination of unfit elementary and secondary school teachers. . . ." The cause was remanded for a further inquiry whether Morrison's "limited non-criminal physical relationship" of a homosexual nature was in fact school related, thereby rendering him "unfit for service."

My colleagues have extended the rule of *Morrison* to the very area over which *Morrison* expressly disclaimed any application. Our court now permits, or at least declares to be beyond school disciplinary redress, a teacher's exposure of grammar school children to a compulsory sordid, debased and sadistic discussion of the human sexual act. It goes further and finds no disciplinable wrong in the classroom circulation of what must fairly be construed as the little girl's written invitation to oral copulation.

Today's majority opinion, as I view it, establishes a new high-water mark in judicially permitted licentiousness—far beyond the purview of *Morrison*—and of all places, in the classroom of a grammar school.

Until now (my research indicates) the high point seems to have been reached in *Barrows* v. *Municipal Court,* 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483]. In *Barrows* another closely divided court held that simulated acts of oral copulation on a public stage between man and woman were constitutionally protected by the First Amendment. Legislative suppression of such things, it was held, would be a tragic "loss to culture." (Cf. *Dixon* v. *Municipal Court,* 267 Cal.App.2d 789 [73 Cal.Rptr. 587]; *In re Mannino* (dissent), 14 Cal.App.3d 953, 980 [92 Cal.Rptr. 880].)

But *Barrows* concerned a public theatrical production to which, presumably, adults alone and they by their free choice, were admitted. In the case at bench the children were legally compelled to attend school (Ed. Code, § 12101), and to "submit to the authority" of the teacher (Ed. Code, § 10609) in their classroom work and discussions.

The record conclusively shows no hasty ill-considered action by defendant. She herself had painstakingly rewritten the students' papers. She had kept them overnight and made copies the next morning. When she circulated a complete set to each student she took special care that no real evidence of what was going on would reach the childrens' parents or the school authorities. As we have pointed out from her own testimony, she explained to her class that the material "could not be kept, but would have to be returned to me at the end of the day and destroyed." She had "told the children at the beginning that this could not go out of the room" because it was something "that is very shocking to people."

Obviously this was no lesson plan of "sound educational approach" as concluded by defendant's witnesses; nor was it so considered by defendant. It was a clandestine effort to have a filthy forbidden discussion known by her to be unacceptable to the school authorities, the children's parents, and even to some of the children. No other reasonable inference is derivable from the careful instructions to return the papers at the day's end so that the evidence might be "destroyed."

Nor do I find "an extenuating circumstance indicating contriteness," because defendant "now feels that she may have made a mistake in judgment." Such feelings are common in persons finding themselves in trouble. And no contrition whatever appears in her present insistent claims that her conduct was proper and permitted under her "academic freedom."

I must agree with my colleague that it is regrettable that the trial court found it necessary to "brand" defendant with "evident unfitness for service" in her chosen profession. But as was the trial court, we are bound to apply the law. We should not allow feelings of compassion to legitimize her conduct, and thus create new and bad law.

Paraphrasing the conclusion of Justice Sullivan, dissenting in *Morrison* (1 Cal.3d at p. 250): I cannot say that "there is no rational connection between [defendant's acts] and [her] fitness to teach. As the trial court properly determined, the [District's] findings were supported by the weight of the evidence and its determination of the issues was supported by its findings. The [District], therefore, did not abuse its discretion. (Code Civ. Proc., § 1094.5, subd. (c).) We have no right to upset its action." I would affirm the judgment of the trial court.

Respondent's petition for a hearing by the Supreme Court was denied August 2, 1972. McComb, J., was of the opinion that the petition should be granted.