[L.A. No. 30059. In Bank. May 31. 1973.]

STANLEY M. LINDROS, Plaintiff and Appellant, v.
GOVERNING BOARD OF THE TORRANCE UNIFIED SCHOOL
DISTRICT, Defendant and Respondent.

## COUNSEL

Arthur Grebow and Stephen E. Kalish for Plaintiff and Appellant.

John D. Maharg, County Counsel, Kenneth E. Reynolds, John J. Wagner and Howard R. Gilstrap, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**TOBRINER, J.**—In this case we examine Education Code section 13443,[1] which establishes the conditions under which the governing boards of local school districts may decline to rehire probationary teachers. At the end of the 1969-1970 academic year, the Governing Board of the Torrance Unified School District[2] terminated petitioner Stanley Lindros, a proba-

---

[1]Except as otherwise noted, all statutory references hereinafter are to the Education Code.

Section 13443 provides probationary teachers with a panoply of procedural and substantive rights. The statute requires school administrators to give notice by March 15, with a statement of reasons, of an intent to recommend against reemployment for the following academic year. It also provides for a hearing upon request before a hearing officer appointed under Government Code section 11500 et seq., for discovery, and for a final decision by the governing board by May 15. The substantive protection afforded by the statute appears in subdivision (d) which declares in relevant part that *"The governing board's determination not to reemploy a probationary employee for the ensuing school year shall be for cause only. The determination of the governing board as to the sufficiency of the cause pursuant to this section shall be conclusive, but the cause shall relate solely to the welfare of the schools and the pupils thereof . . . ."* (Italics added.)

[2]The Governing Board of the Torrance Unified School District will hereinafter be designated as the "Torrance Board" or "Board."

tionary teacher, because he read a theme to his English class which contained controversial language, and because he allegedly on one occasion allowed students to return needed books to the library without proper authorization. ·

For the reasons set forth below, we hold that these incidents fail to establish "cause" for termination which is reasonably "relate[d] to the welfare of the schools and pupils thereof" as required by section 13443, subdivision (d); in so doing we note that in both incidents Lindros acted in the good faith pursuit of concededly legitimate educational objectives, and that the Board demonstrated no significant adverse impact on the students or the school.

The Torrance Board employed petitioner as a tenth-grade probationary English teacher at South High School for the 1969-1970 school year. Petitioner's record attested to his eminent qualification for the position. Not only did he hold a California teaching credential but also he had studied for, or obtained, advanced degrees in philosophy, theology, and the communication arts. A Catholic priest on leave of absence from the Church, petitioner had enjoyed a wide range of experience: he had served as a parish priest, prison chaplain, resident counselor, and secondary level teacher. Nothing in the record suggests that petitioner had failed to fulfill his promise as an effective English instructor or had been unable to relate well with young people; indeed "teacher evaluation" records indicated that he proved himself "above average" in both competency in subject matter and in rapport with students.

The incident which constituted the main charge against the petitioner occurred early in the school year. In mid-October 1969 petitioner assigned his tenth-grade English classes the task of preparing a short story relating a personal emotional experience. The purpose of this assignment, as later described by petitioner, was to stress "the relationship between good creative writing and personal experience. I believe this to be the key in communicating with students and encouraging better writing."

At the request of several students that he present them with an example of his own work, Lindros read a short story, "The Funeral," which he originally wrote as a rough draft for a television play at Loyola University. Autobiographical in nature, the story recorded petitioner's emotions at the funeral of one of his students who, during the time Lindros taught at a predominantly black high school in Watts, died of a heroin overdose. The theme contained language later deemed objectionable by South High's principal—including a slang expression for an incestuous son. We set forth the full text below: ·

"The Funeral

"I was mad, disgusted . . . tense. If Agnes hadn't reminded me I'd still be watching *Shoes of a Fisherman* at the film director's studio. But whether it was guilt or concern, I knew I should be at Ed's funeral at 2 p.m.

"The highway provided me with nothing but a blanket of mist and melancholy. Splashing past 110th and Compton Ave. I caught sight of Greater Antioch Baptist Church just as four of my students were carrying Ed's body into the dismal looking building.

"Water dripped from the ceiling as the small choir intoned, *Come Sweet Jesus.* . . . Only the appearance of plump Rev. Black, Bible in hand, saved us from their uncoordinated efforts.

"I couldn't catch what Black was reading but it was unimportant. I was here, somber, moody, thoughtful; and all to the testimony that I as a white man did care for a young black hipe who died too young . . . too soon.

"Lloyd made it . . . Larry, Fred, Benard, Fuzzy—they were all there. Seemed like every addict in the community was on the scene with his leather jacket and shades, as if to collect . . . or to pay off to Ed. What a lineup! Sargent [*sic*] Masterson from Precinct 77 would have raised a brow or two at this gathering.

"Kelly had tears streaming down his face; perpetually high . . . who could blame him; deserted father, bitch mother; in and out of jail since thirteen. He shot with Ed for the last time that Saturday night.

"The wailing, so characteristic at a Black funeral did not begin until the second stanza of *I Believe,* delivered by Hessie Jones. The little Black kid next to me stared at the solitary tear that rolled down my cheek.

"Why are women so goddam hysterical? Did they really know Ed? Did they care? Were they using Ed's 'time' from their own shackles of welfare and project living? I do not know. I do not live in Watts; but I feel for them now, in their strange melodramatic way.

"Only the obituary read by Sister Maebelle shook me out of my depression. 'Ed Leavy Pollard. Born in Greenwood, Miss., 1952; Died Jan. 11, 1969. . . .' She droned on in a pitifully low, uneducated tone.

"Curley, a steady shooter with Ed was moved to bellow out, 'Louder Lady, I can't hear ya.' Choresetta in the fourth pew from the front

responded to this abrupt remark with a deep shaking sob. The storm grew louder. I noticed at least three leaks from the roof now. God, what a depressing hole; wet, dam [*sic*] pictureless, peeling paint, worn, dam pews; only the cossack of Ed and us. 'Only us O Lord,' I thought 'but what the hell are we here for?'

"I sit here white, middleclass, secure, while the goddam system rapes these poor people of every vestage [*sic*] of dignity.

"Rev. Galine, a slick looking 'Tom' began the eulogy; Jeremiah was the scapegoat. First there was the woman in the back row. She was joined by three others; then another . . . and another; soon everyone in the drama had his chance to chant a response back to the Baptist Preacher; 'Oh Lord' . . . 'That's right' . . . 'I'm listnin' . . . 'Speak God.' . . . Only the periodic gasping signs (sobs) interrupted the Rev's show.

"Ed would have rolled over and grimaced if he would have heard the hysterics when David, his classmate, opened his cossack for the finale. The weeping and gnashing lasted long enough for all of us to troop past Ed and glance at his ashen, black face.

"I felt whipped out; this was a strange two hours; strange to a white who had no blackness in him; strange to a white who knew no such poverty and desperation; even stranger outside when I greeted a young Black in a Panther-like outfit: 'White-mother-fuckin Pig.' . . ."

Before reading the controversial words at the end of "The Funeral," petitioner pondered their appropriateness for the classroom, and decided in good faith that their use was permissible in some, but not all, of his classes.[3] As petitioner stated, although he recognized that "a few words in 'The Funeral' [were] not acceptable in common usage . . . [he] felt that even if one student was to give up or think less of drugs, the reason for

---

[3]Although the hearing officer did not find expressly that Lindros acted in good faith in pursuit of bona fide educational purposes, we believe that such a finding is implicit in the final paragraph of the hearing officer's proposed decision: "Another relevant consideration is the problem of judgment and professionalism. It should require no argument to support the proposition that the District's Governing Board, as the ultimate employer of the teacher on behalf of the citizens of the district, has the right to control the teacher by promulgating the standards of conduct which it deems appropriate. These standards may allow broad discretion or may be explicit. Here, as is true of much in the field of education, a latitude has been allowed for the exercise of the professional judgment of the educational administrators and the teachers. Whenever latitude for judgment is granted there will be inevitable variances in its exercise by the individuals involved. The superior may reasonably anticipate that the subordinate's exercise of judgment will vary from his own and, particularly in the case of a beginning employee, that it will be at times erroneous."

reading the play was justified." Lindros read the young black's objectionable and defiant remark at the end of the story only in college preparatory classes, which he considered most mature; in other classes he substituted the initials "W.M.F.P." While petitioner did not preliminarily consult with school administrators as to whether he should read the story, his conduct accorded with the prevailing policy of the school that instructors could select outside instructional material. According to the hearing officer "There [was] widespread use of outside instructional material selected by the instructors and not submitted for approval." Moreover, school administrators had promulgated "no clear statement of the criteria or standards [to be] applied in selecting this material."

Furthermore, the prevailing practices and conditions at the high school strongly indicated that the inclusion of the language in a literary composition would evoke no concern. The library shelved books, readily available to students, which contained words identical to all of those found in "The Funeral"; school administrators, moreover, as part of the curriculum, had permitted instructors to take students to theatrical performances in which the lines spoken by the actors contained the same or similar words.

No disruption of classroom activities followed petitioner's reading of "The Funeral." As the hearing officer noted, "In considering the seriousness of the use of the offending material . . . these words were presented fully or by their initial letters to five classes of a total of approximately 150 students. No complaint arose from the students and none arose from the parents of these students. This will not establish that the material was appropriate for classroom use but does tend to establish that the context and manner of presentation was not nearly so startling to the students who heard it . . . as the disembodied restatement of the offending words makes it appear."

Despite this seemingly indifferent reaction, the principal of the high school learned of the incident and reprimanded Lindros. The principal counseled Lindros that the language of the short story did not accord with established classroom usage and that further use of vulgar material should be avoided; petitioner agreed to abide by this directive and signed a statement to that effect. This meeting closed the incident until the end of the school year, some eight months later, when the Torrance Board announced that it would not rehire Lindros. As both the hearing officer and the superior court later found, the reading of "The Funeral" constituted the "gravamen" of the Torrance Board's complaint against Lindros.[4]

---

[4]The superior court declared that "the substantive charge involved, as the hearing officer said, and I agree with him, the gravamen of these proceedings [was] the use

In addition to the incident involving "The Funeral," the hearing officer found Lindros to have permitted students to leave class on one occasion without the authorization normally required by school regulations.[5] On February 6, 1970, petitioner allowed students in one class to depart a few minutes before the "sounding of the bell signalling the close of the class session." Lindros "had instructed those of his students who were in possession of a book entitled *Zorba the Greek* to depart from class early, secure the book from their lockers, and return the book to the library so that it could be redistributed when needed by the students of another English instructor. . . . It was not established that all of those students who departed were leaving to complete this errand."

After the superintendent of the Torrance School District served notice of an intention not to rehire Lindros because of the aforementioned incidents, the Board held an administrative hearing pursuant to subdivision (b) of section 13443. At this proceeding the hearing officer found that " 'The Funeral' is not within the generally accepted standard and that its use would violate the policy of the school in regard to the introduction of objectionable language into the classroom." He further found that although "[t]he school does sanction the use of literary work and current periodical material in which socially unacceptable words and phrases appear . . . [The Funeral] is not a generally accepted literary work and does not appear within a generally accepted periodical. [Petitioner's] lapse of judgment and violation of standards is a factor relating to the

of this short story, 'The Funeral,' with its coarse language at the end"; the hearing officer, however, found that the "gravamen" of the charges against Lindros included not only the reading of "The Funeral" but also use of copies of the lyrics from the song "The Pusher" in one of Lindros' classes on January 30, 1970. These lyrics were distributed by one of Lindros' students who presented a class report on drug use. "The Pusher," according to the findings of the hearing officer, was a popular score taken from the motion picture "Easy Rider" and was at the time widely disseminated in radio broadcasts and readily available in phonographic record shops. In fact, the lyrics of "The Pusher" had been used by other instructors at South High School. The hearing officer concluded that "The Pusher" was a work of "established usage" and that its use did not constitute "cause" within the meaning of Education Code section 13443. The Torrance Board later adopted this finding as its own; thus this alleged incident of "misconduct" is not before us here. Other minor charges against petitioner—not discussed in the text—were rejected by the hearing officer or the superior court. (See fn. 5, *infra.*)

[5]Lindros was originally charged with three additional isolated incidents of misconduct. First, he allegedly permitted students to write vulgar phrases on their desks and on the bulletin board on a single day in December. As to this charge, the hearing officer found that "The necessarily alleged element of permission was not established" since "[i]t was affirmatively established that [petitioner] had neither by word nor by deed caused the inscribing of these words."

In addition, Lindros was charged with, on one occasion, uttering a swear word at a fellow teacher in the presence of a third teacher. He apologized the next day.

welfare of the students and the school." Though he found that the incident involving "The Funeral" was the "gravamen" of the complaint, the hearing officer also declared that the February 6, 1970, incident involving early dismissal of students from class constituted "cause" under section 13443.

The Torrance Board, without examining the record of the administrative hearing, adopted the hearing officer's report as its own; the Board further declared that each charge "separately and collectively" constitute[d] . . . sufficient cause not to reemploy [petitioner]." '

Following the Torrance Board's final decision, Lindros petitioned the Los Angeles Superior Court for a writ of mandate under Code of Civil Procedure section 1094.5. In denying the petition the superior court declared that the language of "The Funeral" is "manifestly coarse and vulgar" and that "[p]etitioner should have known that such language by a teacher was totally unacceptable in a Tenth Grade English class." The superior court then noted that the charges relating to both "The Funeral" and the February 6, 1970, incident involving early dismissal of students "were found to be related to the welfare of the school and the pupils thereof, and the Governing Board's determination of sufficiency is conclusive." We believe that this holding cannot be sustained because petitioner's conduct did not, as a matter of law, constitute cause for termination within the meaning of Education Code section 13443. We turn now to an analysis of section 13443, and of the errors which we perceive in the superior court's denial of the writ of mandate.

I. *The question whether alleged misconduct establishes "cause" under section 13443, subdivision (d), constitutes a question of law.*

Education Code section 13443, subdivision (d), defines the conditions under which a local school board can refuse to rehire a probationary teacher. The statute provides that: "The governing board's determination not to reemploy a probationary employee for the ensuing school year shall be for cause only. The determination of the governing board as to the sufficiency of the cause pursuant to this section shall be conclusive, but the

---

The hearing officer found that "while objectionable" this incident occurred "privately between two men in disagreement and has had no substantial impact upon the school or the pupils thereof, and therefore, does not constitute a cause not to rehire . . . within the meaning of section 13443." The Torrance Board ultimately accepted this conclusion as its own.

Finally, petitioner was charged with leaving his classroom unattended for a few minutes on a single day in October in violation of school regulations. The superior court found this allegation unsupported by substantial evidence and the Torrance Board has not challenged that determination here.

cause shall relate solely to the welfare of the schools and the pupils thereof . . . ."

■ The precedents clearly establish that the question whether a particular cause for refusal to rehire relates "solely to the welfare of the schools and the pupils thereof" presents a matter of law that must be determined by the courts, and, ultimately by this court. The Board determines the *facts* and their sufficiency to support the Board's determination but the court decides whether the facts as found—in our case, the conduct of the teacher— reasonably could be said to have adversely affected the welfare of the school or its pupils.

In the fountainhead case of *Griggs* v. *Board of Trustees* (1964) 61 Cal.2d 93 [37 Cal.Rptr. 194, 389 P.2d 722], a school board refused to rehire a probationary teacher for "lack of self-restraint and tact in dealing with co-workers, pupils, and parents." (*Id.* at p. 97.) We interpreted section 13443 (then § 13444) to mean that "where there is evidence to support the board's findings of fact *and where the cause for dismissal found by the board can reasonably be said to relate to the 'welfare of the schools and pupils thereof,'* the reviewing court may not consider whether the facts found are sufficiently serious to justify dismissal." (*Id.* at p. 96.) (Italics added.) The *Griggs* court then found a reasonable relationship between the "cause" (lack of tact) and the "welfare of the schools." (*Id.* at p. 97.)

We more recently examined the division of responsibilities between courts and governing boards under section 13443 in *Bekiaris* v. *Board of Education* (1972) 6 Cal.3d 575 [100 Cal.Rptr. 16, 493 P.2d 480]. "It is to be emphasized . . . that [under section 13443] the general applicability of the rule of substantial evidence in light of the entire record does not affect the power and duty of the trial court to make an independent determination of questions having a legal character. Thus '[n]othing . . . prevents the reviewing court from determining whether the board has proceeded in excess of jurisdiction, whether there has been a fair trial, and whether the board's findings of fact are supported by substantial evidence.' [Citation.] Moreover, it is for the *court to determine whether a particular cause for dismissal 'relate[s] solely to the welfare of the schools and the pupils thereof'* as required by section 13443. [Citations.]" (*Id.* at p. 587.) (Italics added.)

We further explained that "although the reviewing court must accept evidentiary facts shown by substantial evidence and the sufficiency of those facts to constitute a stated cause, still it remains for the court to determine *as a matter of law* whether such cause relates to the welfare of the school and its pupils and is therefore adequate under the provisions of section 13443 to justify dismissal." (*Id.* at p. 589.) (Italics in the opinion.)

The Courts of Appeal have consistently followed this approach. Thus, the court in *Blodgett* v. *Board of Trustees* (1971) 20 Cal.App.3d 183 [97 Cal.Rptr. 406], held that refusal to rehire a probationary teacher solely because she was overweight was not a "cause" reasonably related to school welfare; the "physical condition unrelated to the plaintiff's fitness to teach was used as a pretext for refusing re-employ[ment]." (*Id.* at p. 193.) In *Thornton* v. *Board of Trustees* (1968) 262 Cal.App.2d 761 [68 Cal.Rptr. 842], the Court of Appeal held refusal to rehire solely because a probationary teacher was 65 years old was not "cause"[6] reasonably related to the welfare of the school.

In sum, whether particular conduct establishes cause under section 13443, poses a pure question of law. This question must be sharply distinguished from two other types of questions which arise under section 13443: (1) questions of *fact* and (2) questions as to the *sufficiency* of the "cause" to warrant dismissal in light of all the circumstances. Past cases have held that findings of fact, developed by the hearing officer and the governing board, will be upheld by the courts so long as supported by substantial evidence on the whole record. (*Griggs* v. *Board of Trustees, supra,* 61 Cal.2d at p. 96.)[7] Similarly, the determination as to the "sufficiency of the cause"—whether the "cause" warrants a refusal to rehire despite the teacher's redeeming qualities as a teacher, his attitude, and the particular needs of the school district—lies solely in the discretion of the governing board *so long as* section 13443's requirement of "cause . . . relate[d] solely to the welfare of the schools and the pupils thereof . . ." has been met. (*Bekiaris* v. *Board of Education, supra,* 6 Cal.3d at p. 589.)

Having demonstrated that the determination of "cause" under section 13443 constitutes a question of law, we turn to an examination of that issue in light of the two charges of misconduct against petitioner Lindros.

---

[6]In 1969 the Legislature, in response to the *Thornton* holding, amended Education Code section 13325 to make it apply to probationary, as well as permanent, employees (Stats. 1969, ch. 795, p. 1613, § 1); section 13325 provides that upon reaching age 65 "employment shall be from year to year at the discretion of the governing board." In extending to governing boards this plenary power over probationary teachers reaching the age of 65 (*Taylor* v. *Board of Education* (1939) 31 Cal.App.2d 734 [89 P.2d 148]), the Legislature impliedly recognized that the authority of governing boards is not as extensive under section 13443. (*Ladd* v. *Board of Trustees* (1972) 23 Cal.App.3d 984, 989-991 [100 Cal.Rptr. 571].)

[7]Since neither party has challenged the applicability of the substantial evidence scope of review to this proceeding, we have not addressed the question whether a higher standard of review should apply.

## II. *The reading of "The Funeral" did not constitute "cause" under section 13443.*

▮ Lindros' reading of the composition did not constitute "cause" under section 13443 because, first, in presenting it to his pupils petitioner sought to pursue a bona fide educational purpose and in so doing did not adversely affect "the welfare of the schools or the pupils thereof"; second, the composition was used as teaching material without prior reasonable notice that such use would later be deemed impermissible by school authorities. We shall separately analyze each of these propositions.

### A. *In reading "The Funeral" petitioner sought to pursue a bona fide educational purpose and in so doing did not adversely affect the welfare of the school or the pupils thereof.*

Erroneously applying a per se approach to the controversial epithet at the end of "The Funeral," the superior court declared that its use was "manifestly coarse and vulgar." The court, however, apparently failed to make the crucial distinction between unrestricted use of such words in the classroom and their inclusion in teaching material for a class in creative writing.

Petitioner is the first to concede that it would be "outrageous . . . if a teacher simply shouts 'mother-fucking-pigs' to his students." Obviously teachers are not to sanction the use of words as blatantly offensive as these in classroom discussion or even in the personal banter of students. But here the words were used by a character in a story; the story, in turn was presented as an example of expressive writing. The black character utters the words in "The Funeral" as a mark of his anger and disgust at a white's presence at the funeral; the words were employed for a definite literary objective. Thus, Lindros read the story to his students as part of a quite obvious teaching technique.

Many classic works seeking to capture the anger of blacks against a society that they consider inexcusably oppressive are peppered with epithets that express outrage in terms at least as violent as that used here. Malamud's "The Tenants" is a recent example; "Man-Child in a Promised Land" by Claude Brown is another. Baldwin's "The Fire Next Time," written, as it is, by a black, is the most virulent; we could cite innumerable other examples. The writer of "The Funeral" could not properly convey the fury of the young black at the apparent condescension of a white man in attending the funeral except by the use of an expletive. The outrage of the black *had* to be mirrored in language that outraged.

Lindros was obviously trying to teach his students that in writing creative compositions the author must attempt to put those words in the mouths of his characters that belong there. The blasphemous epithet must fit the emotional outburst of the speaker. To isolate the epithet and to condemn the teacher is to miss the function of expressive writing. In sum, we could not impose upon teachers of writing, as a matter of law, that they must tell and teach their students that in depicting the jargon of the ghetto, the slum, or the barrack room, characters must speak in the pedantry of Edwardian English.

The record shows that neither student nor parent complained about this use of the lurid words in Lindros' composition. The students had been exposed to identical langauge in books and periodicals in the school library; their teachers had taken them to dramatic productions that used these and other obnoxious terms. That the students were not "shocked" can come as no surprise.

Finally, the United States Supreme Court has recognized the widespread use of current, divergent and distasteful patterns of speech, such as those involved here; indeed, in some situations that court has accorded constitutional protection to similarly shocking and offensive language. For example, the Supreme Court recently held the phrase "fuck the draft" protected by the First Amendment when portrayed on a jacket worn in a courthouse corridor. (*Cohen* v. *California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780].) Although *Cohen* involved a controversial term in expressing a political view in a public forum and is thus distinguishable from the instant situation, we note its reasoning: "How is one to distinguish this from other offensive words? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below. For, while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric." (*Cohen* v. *California, supra*, 403 U.S. at p. 25 [29 L.Ed.2d at p. 294].)

Three recent cases in which the Supreme Court vacated criminal convictions for offensive speech and remanded in light of *Cohen* v. *California, supra*, 403 U.S. 15, illustrate the same point. In *Rosenfeld* v. *New Jersey* (1972) 408 U.S. 901 [33 L.Ed.2d 321, 92 S.Ct. 2479], the defendant was convicted of disturbing the peace by indecent and offensive language; he had addressed a school board meeting, attended by some 40 children,

using, on several occasions in his speech, the words "mother fucker"; in *Brown* v. *Oklahoma* (1972) 408 U.S. 914 [33 L.Ed.2d 326, 92 S.Ct. 2507], the defendant, during a speech before a group of men and women in the University of Tulsa chapel, referred to policemen as "mother fucking fascist pig cops"; in *Lewis* v. *City of New Orleans* (1972) 408 U.S. 913 [33 L.Ed.2d 321, 92 S.Ct. 2499], a mother addressed police officers who had arrested her son as "god-damned-mother-fucking-police."

These cases illustrate both the use of such speech in sections of our multifarious society and an increasing immunity from criminal sanction for such expressions. While these rulings by no mean legitimize the general use of offensive language in the classroom, they do explain the background and reasons for the use of such words in literary works depicting realistically the coarse and strident forms of communication that so often attend public dialogue today.[8]

We conclude that the Board has failed to show that the inclusion of opprobrious language currently used in many subcultures, in a single composition, presented solely for teaching purposes, rises to the level of a legal cause for severance of a teacher from his employment.

B. *The reading was only a single incident in the presentation of teaching material which, although later deemed objectionable, was used in the absence of prior reasonable notice that such use would be deemed impermissible by the school authorities.*

As we have pointed out, the accepted policy at South High School permitted the selection of instructional material by teachers without submission to administrators for advance approval. Moreover, as we have explained, books and periodicals at the school library contained language as controversial as that found in "The Funeral"; further, students with the sponsorship of their teachers attended plays in which such language was employed. In the previous section we have alluded to the unfortunate current prevalence of language as repulsive as that we face here. The record shows no specific disapproval of the use of written material containing such expres-

---

[8]"If standards of taste of future generations are to be elevated it will not be accomplished by those who seek to sweep distasteful matters under the rug, or by self-embarrassed school trustees who discharge as unfit those who would bring the problem out in the open for discussion." (*Oakland Unified Sch. Dist.* v. *Olicker* (1972) 25 Cal.App.3d 1098, 1112 [102 Cal.Rptr. 421] (Sims, J., concurring.).) Several federal cases illustrate the serious constitutional questions which arise when school authorities seek to curb the academic freedom of teachers to employ techniques supported by substantial opinion in the teaching profession. (*Keefe* v. *Geanakos* (1st Cir. 1969) 418 F.2d 359; *Parducci* v. *Rutland* (M.D.Ala. 1970) 316 F.Supp. 352.)

sions. Under these circumstances we must conclude that petitioner acting in good faith, presented the composition to the class without prior reasonable notice that such presentation would contravene the governing policies of the high school.[9]

We do not believe that one isolated classroom usage of material later deemed objectionable by school administrators, without reasonable prior notice, can constitute "cause" for termination reasonably "relate[d] solely to the welfare of the schools or pupils thereof." "Cause" under section 13443 requires that the teacher must have failed to exercise such reasonable judgment as would be expected of a member of his profession under the same circumstances. "Teachers, particularly in the light of their professional expertise, will normally be able to determine what kind of conduct indicates unfitness to teach. Teachers are further protected by the fact that they cannot be disciplined merely because they made a reasonable, good faith, professional judgment in the course of their employment with which higher authorities later disagreed." (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 233 [82 Cal.Rptr. 175, 461 P.2d 375].)[10]

III. *The incident involving dismissal of students on one school day fails to establish "cause" reasonably related to the welfare of the schools and was not the true reason for the Board's refusal to rehire Lindros.*

■  We turn to the remaining charge that on one occasion during the school year Lindros permitted students to leave one of his classes "without proper authorization." A close review of the findings pertinent to the incident reveals that it was not conclusively established that Lindros violated any school rule, and that, in any event, the isolated *de minimis* violation charged was a mere makeweight that did not constitute the true reason for the Board's refusal to rehire Lindros.

[9]We reject the assertion of the respondent Torrance Board that because petitioner refrained from actually reading the controversial words in question in some of his classes, he necessarily knew their use would be considered objectionable. To the contrary, Lindros' discriminating use of the controversial language in his more mature college prep classes only demonstrates his good faith effort to discern when the usage would serve a bona fide educational purpose.

[10]See *Oakland Unified Sch. Dist.* v. *Olicker* (1972) 25 Cal.App.3d 1098, 1110 [102 Cal.Rptr. 421], applying the same reasoning as to lack of notice to a teacher dismissal case under Education Code section 13403. Several federal cases, moreover, have accepted the notice argument in the context of constitutional due process and academic freedom challenges to teacher dismissals. (See *Mailloux* v. *Kiley* (D.Mass. 1971) 323 F.Supp. 1387, affd. 448 F.2d 1242; *Keefe* v. *Geanakos* (1st Cir. 1969) 418 F.2d 359, 362; *Webb* v. *Lake Mills Community School District* (N.D. Iowa 1972) 344 F.Supp. 791, 800-801, 804-805; *Parducci* v. *Rutland* (M.D.Ala. 1970) 316 F.Supp. 352, 357; cf. *Presidents Council, Dist. 25* v. *Community Sch. Bd. No. 25* (2d Cir. 1972) 457 F.2d 289, 293-294.)

The hearing officer's findings of fact, later adopted by both the Torrance Board and the superior court, contain ambiguities which cast doubt on the assertion that Lindros improperly dismissed his class;[11] these ambiguities strengthen our conclusion that the charge of improper dismissal of students did not trigger the action against Lindros. The record indicates that on February 6, 1970, Lindros dismissed some students for the legitimate educational purpose of returning needed copies of the book, *Zorba the Greek,* to the library. Nothing suggests that this action, by itself, violated any school rule. Although it "was not established that all of those students who departed" actually followed petitioner's instructions, Lindros could hardly be dismissed merely because he failed to prove that all of the students obeyed his instructions and went to the library after leaving his classroom. Thus the findings of fact could not support a conclusion that Lindros failed to "authorize" his students to go to the library.[12]

As the hearing officer found, however, de facto school policy required a teacher to provide a *written* authorization when sending more than five students to the library; conceivably, Lindros violated a school regulation, not by dismissing his students, but by failing on this single occasion to furnish a written "hall pass." The hearing officer's decision, however, omitted any findings about this vital fact. The findings therefore do not directly support even the conclusion that Lindros dismissed the students without proper *written* authorization. (Cf. *Almaden-Santa Clara Vineyards* v. *Paul* (1966) 239 Cal.App.2d 860, 867-868 [49 Cal.Rptr. 256].)

---

[11]We set forth the full findings pertinent to this issue: "F. On approximately February 6, 1970, at the close of a class session the students in the class then being instructed by respondent departed from the room with few exceptions and without being dismissed by respondent and prior to the sounding of the bell signalling the close of the class session. It was established that on this date respondent had instructed those of his students who were in possession of a book entitled 'Zorba the Greek' to depart from class early, secure the book from their lockers, and return the book to the library so that it could be redistributed on the morning of February 19th when it was needed by the students of another English instructor. It was not established that all of those students who departed were leaving to complete this errand. It is contrary to school policy to permit students to be out of class during the class time without a proper pass, with the limited exception that five students at a time may be permitted to be in the hallway for the purpose of obtaining or returning books at the bookroom in the library."

[12]One of petitioner's supervisors, the sole witness for the Board on the charge of early dismissal of students, testified that he observed students leave Lindros' class *without any authorization.* Petitioner's testimony contradicted that of his supervisor; petitioner attested that he authorized his students to leave class to return copies of *Zorba the Greek* to the library. Testimony of other teachers indicated that Lindros had been asked to arrange for the return of these books. Though the findings of the hearing officer (*supra,* fn. 11) contain ambiguities, apparently the hearing officer accepted petitioner's version that he *did not* dismiss his class early, but rather authorized his students to go to the library.

In any event, the record makes clear that the reading of "The Funeral" comprised the "gravamen" of the charges, and that the refusal to rehire rested upon this foundation. We are reminded here of the incisive language of *Bekiaris* v. *Board of Education, supra,* 6 Cal.3d 575, 592-593, that "a dismissed public employee is entitled to a judicial determination of the *true* reason for his dismissal . . ." (italics in the original). Although *Bekiaris* condemned a dismissal involving constitutional rights, its logic equally applies in the instant situation involving statutory rights. Since both the hearing officer and superior court found that "The Funeral" comprised the "gravamen" of the complaint against petitioner, we believe that charge was the "true reason" for the refusal to rehire.[13]

Furthermore, to assume that the Torrance Board would have refused to rehire Lindros based *solely* on the incident of February 6 stretches the credible. The incident at most involved a single, unrepeated infraction of a minor regulation in mid-year, with no showing of any adverse impact on the educational process, and with no showing that it occurred by other than mere inadvertence. We doubt that the Torrance Board would have acted so harshly as to ignore Shakespeare's common sense observation that "men are men; the best sometimes forget." (Shakespeare, Othello, II (1604).)[14]

---

[13]As the superior court declared, "That brings us to what I suppose might be called *the substantive charge* involved, as the hearing officer said, and I agree with him, the *gravamen* of these proceedings, that is, the use of this short story, 'The Funeral'." (Italics added.) The meaning of "gravamen" is clear; "gravamen" means the "material part of a grievance, charge, etc." (Webster's New Internat. Dict. (2d ed. 1957) unabridged.)

This conclusion of the hearing officer and superior court was supported by substantial evidence. The principal of South High School testified that he would not have recommended against rehiring Lindros based solely on the alleged dismissal of students without proper authorization.

"Q: [hearing officer] 'The Funeral' was the most compelling incident?

"A: [the principal] Yes.

" . . . . . . . . . . . . . . . .

"Q: . . . That's not a very good question, but would you have based a recommendation of not to rehire a teacher upon an incident [of] permitting students to leave?

"A: Perhaps not."

[14]We find further support for our conclusion that the gravamen for the refusal to rehire was the reading of "The Funeral" in the action of the Torrance Board itself; the Board, in effect, agreed that the incident involving "The Funeral" constituted the material complaint. Although the Board declared that the charges "separately and collectively constitute[d] . . . sufficient cause not to reemploy," the Board also accepted the position of the hearing officer that the charge relating to "The Funeral" formed the real basis for the action against petitioner. As the Board concedes, under section 13443, subdivision (c), the hearing officer conducts a hearing and prepared a proposed decision; based on the record of this hearing and the "proposed decision"

Summarizing the case as a whole, we conclude that the Board's refusal to rehire petitioner was invalid because it was not for cause reasonably related to the Welfare of the school.[15] We heed Judge Wyzanski's characterization of fundamental public policy: that education must "foster open minds, creative imaginations, and adventurous spirits. Our national belief is that the heterodox as well as the orthodox are a source of individual and of social growth. We do not confine academic freedom to conventional teachers or to those who can get a majority vote from their colleagues. Our faith is that the teacher's freedom to choose among options for which there is any substantial support will increase his intellectual vitality and his moral strength. The teacher whose responsibility has been nourished by independence, enterprise, and free choice becomes for his student a better model of the democratic citizen." (*Mailloux* v. *Kiley* (D.Mass. 1971) 323 F.Supp. 1387, 1391.)

The judgment of the superior court denying the writ of mandate is reversed, and the cause is remanded to the superior court for proceedings consistent with this opinion.

Wright, C. J., Mosk, J., Sullivan, J., and Roth, J.,* concurred.

**BURKE, J.**—I dissent. The majority have wholly emasculated the provisions of section 13443, subdivision (d), of the Education Code which, until now, assured that a local school board's decision as to the sufficiency of the cause for failing to reemploy a probationary teacher was *conclusive* and free from judicial interference. The "cause" which led defendant district to refuse to reemploy Lindros was his *classroom* use of improper, indecent language. Since the use of such language in a tenth-grade classroom obviously is a matter of relating to "the welfare of the schools and the pupils thereof . . ." (Ed. Code, § 13443, subd. (d)), the district's determination concerning the sufficiency of that cause should have been "conclusive." (*Id.*) Instead, the majority have rendered that determination wholly *inconclusive,* by relying upon a variety of supposedly mitigating

---

the Board then makes its determination; under the Government Code the Board can *either* adopt the "proposed decision" *in its entirety* (Gov. Code, § 11517, subd. (b)) or make further findings "upon the record" of the administrative hearing (Gov. Code, § 11517, subd. (c)). Here the Board did *not* examine the record of the administrative hearing or make further findings; accordingly, it adopted the hearing officer's determination *in its entirety* under section 11517, subdivision (b)—including the finding that "The Funeral" constituted the gravamen of the complaint.

[15]We therefore need not reach petitioner's other contention that his discharge was invalid on various procedural grounds as well.

*Assigned by the Chairman of the Judicial Council.

factors (such as Lindros' asserted "good faith") which more properly were matters of sole concern to the district in appraising the sufficiency of the cause for terminating Lindros' services. More importantly, however, and wholly apart from the particular circumstances surrounding this case, the majority's approach can be employed in future cases involving probationary teachers to undermine and defeat the clear legislative intent to vest in the local school board plenary control over these matters.

Section 13443, subdivision (d), carefully allocates the respective responsibilities of the school boards and the courts in cases involving refusals to rehire probationary teachers. That section expressly makes the governing board's determination as to the sufficiency of the cause "conclusive," so long as that cause relates to the welfare of the school or its pupils. As stated in *Griggs* v. *Board of Trustees*, 61 Cal.2d 93, 96 [37 Cal.Rptr. 194, 389 P.2d 722], the landmark case in this area, "Nothing in the language of section 13444 [now § 13443] prevents the reviewing court from determining whether the board has proceeded in excess of jurisdiction, whether there has been a fair trial, and whether the board's findings of fact are supported by substantial evidence. However, *where there is evidence to support the board's findings of fact and where the cause for dismissal found by the board can reasonably be said to relate to the 'welfare of the schools and the pupils thereof,' the reviewing court may not consider whether the facts found are sufficiently serious to justify dismissal.*" (Italics added.)

In *Griggs*, the "cause" for the board's decision was the teacher's "lack of self-restraint and tact in dealing with co-workers, pupils and parents." Since substantial evidence existed to support the existence of that cause, and since that cause "is clearly a matter which relates to the welfare of the school and its pupils," this court held that "the trial court could not properly substitute its own judgment for that of the board on the question of the sufficiency of the cause for Mrs. Griggs' dismissal." (P. 97.) I stress the fact that this court did not purport to reappraise the "good faith," "lack of significant adverse impact," or other possible mitigating factors in Mrs. Griggs' favor, unlike the majority's approach in this case, for such matters were exclusively within the domain of the school board.[1]

---

[1]The majority have substantially misstated the test set forth in section 13443 and the *Griggs* case. Although correctly explaining that the role of the courts is limited to determining whether the cause for termination *relates* to the welfare of the school or its pupils (*ante,* pp. 532-534), the majority purport to apply that test by inquiring whether in fact the teacher's conduct *adversely affected* the welfare of the school or its pupils. (*Ante,* at p. 527, line 10, p. 533, line 9, p. 535, line 5,

Subsequent cases have uniformly employed the *Griggs'* approach, namely, to determine only whether or not the *type* of conduct at issue (e.g., lack of tact) can be said to reasonably relate to the welfare of the school and its pupils. For example, in *Raney* v. *Board of Trustees,* 239 Cal.App.2d 256 [48 Cal.Rptr. 555], the "cause" relied upon by the school board was the teacher's severe grading techniques and poor rapport with students. The court explained that were it at liberty to supervise the judgment of the board on the matter, the court "might well reach an opposite conclusion . . . . [B]*ut our theory of government gives to the school trustees, for better or for worse, an almost absolute choice either to 'hire or fire' teachers who have not yet attained tenure.*" (Italics added; p. 260.)

Similarly, in *American Federation of Teachers* v. *San Lorenzo etc. Sch. Dist.,* 276 Cal.App.2d 132, 136 [80 Cal.Rptr. 758], the court held that a probationary teacher's inability to accept responsibility and inadequate supervision of students "certainly relate to the welfare of the schools and the pupils . . . ." Accordingly, the court explained that it "cannot consider whether the charges justify dismissal." (See also *Governing Board* v. *Brennan,* 18 Cal.App.3d 396 [95 Cal.Rptr. 712] [teacher advocated marijuana use]; *McGlone* v. *Mt. Diablo Unified Sch. Dist.,* 3 CalApp.3d 17 [82 Cal.Rptr. 225] [failure to supervise students]; *Feist* v. *Rowe,* 3 Cal. App.3d 404 [83 Cal.Rptr. 465].)

The two cases which reversed school board decisions in this area are not on point for they merely established that physical characteristics of a teacher, such as advanced age or obesity, cannot constitute "cause" under section 13443 since neither factor standing alone could involve the welfare of the school or students. In the instant case, on the other hand, the cause for Lindros' termination was his *classroom* use of indecent language, a matter which (like the lack of tact in *Griggs,* the severe grading techniques in *Raney,* or the inadequate supervision in *San Lorenzo*) by its very nature relates to the welfare of the school and its pupils. Of course, depending upon the underlying circumstances in each case, including the teacher's "good faith" or the lack of any "significant adverse impact," the school board might determine that a particular act or impropriety is excusable and insufficient cause for refusal to reemploy. Yet that decision lies with the school board, not the courts.

pp. 535-537.) Yet the question of adverse effect is precisely the question reserved to the school board by section 13443—otherwise a court could in every case reverse the board's decision by finding that particular conduct had no "significant adverse impact" (*ante,* at p. 527, line 10) on the school or its pupils.

As I interpret section 13443, the Legislature intended to vest the school board with sole discretion in appraising the sufficiency of the cause, but to assure that the cause asserted has some reasonable relation to the school and its pupils rather than pertaining solely to the teacher's private life, unrelated to school affairs. For example, a court might properly hold that a teacher's persistent refusal to obey his parents, his inability to teach his wife how to drive, his failure to keep timely dental appointments, or his intemperate language with his neighbors, were acts of a type which could not reasonably relate to the welfare of the school or its pupils under section 13443. Yet similar acts of insubordination, incompetence, tardiness or use of indecent language, when occurring in a classroom setting or otherwise affecting school affairs, clearly would meet the statutory test.

In the instant case, Lindros used language *in his classroom* which many persons deem objectionable in any context.[2] Indeed, it is well established that even permanent, tenured teachers are subject to appropriate discipline, including dismissal, on account of their classroom use of indecent or profane language. (See *Board of Trustees* v. *Metzger,* 8 Cal.3d 206, 212 [104 Cal.Rptr. 452, 501 P.2d 1172]; *Palo Verde etc. Sch. Dist.* v. *Hensey,* 9 Cal.App.3d 967 [88 Cal.Rptr. 570].) Accordingly, the district certainly had statutory authority to refuse to reemploy Lindros for the coming year.

The majority stress such factors as Lindros' "good faith," his "bona fide educational purpose," the lack of complaints from his students, and the absence of school rules or regulations prohibiting the use of crude and vulgar language by teachers. Once again, it is apparent to me that consideration of such allegedly mitigating factors is for the school board, not the courts. If the board, in the exercise of its discretion and expertise, chooses not to reemploy a probationary teacher who uses such language, on what basis can this court interfere with that decision? Certainly there is no rule of law, statutory or otherwise, which would require advance publication of elaborate regulations and guidelines anticipating all possible infractions or misconduct which a probationary teacher might commit.[3] As the trial court pointed out, Lindros' language was "manifestly coarse and vulgar.

---

[2] Since the district's action in this case can be sustained on the basis of Lindros' improper language in his classroom, I do not reach the question whether that action could also be upheld on the independent ground that Lindros permitted unauthorized departure of students from his class.

[3] The majority's reliance upon the so-called "free-speech" cases (e.g., *Cohen* v. *California,* 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780]), seems wholly misplaced, for no attempt is made to subject Lindros to criminal liability for his conduct. As conceded by the majority (*ante,* p. 537), "these rulings by no means legitimize the general use of offensive language in the classroom . . . ."

. . . [P]etitioner should have known that such language by a teacher was totally unacceptable in a Tenth Grade English class."

The Court of Appeal, Second District, in the vacated opinion in this case written by Presiding Justice Ford (103 Cal.Rptr. 188), aptly disposed of plaintiff's contention regarding lack of notice: "There is no ironclad rule of law that regulations or rules be promulgated which specify in minute detail the various kinds of misconduct which will subject a teacher to disciplinary action. It is not unreasonable to assume that a person engaged in the profession of teaching will have a reasonable concept of generally accepted standards relating to propriety of conduct, including the avoidance of vulgarity, and will adhere to such standards in his relationship with his pupils. . . .

"Adhering to an objective standard, in the present case it was not unreasonable to determine that the plaintiff was on notice that in teaching his tenth grade English classes the art of writing a short story and in affording his students aid by using as a model a short story written by him, resort to a particular story embodying vulgarity would not serve a substantial educational purpose but would constitute a serious impropriety because of the extraneous matter of an unexemplary nature. Since manifestly inherent in such conduct was the probability of an effect adverse to the welfare of students, it was reasonable to assume that the teacher was aware that he was thereby subjecting himself to the hazard of disciplinary measures. Consequently, his contention as to the lack of adequate notice to satisfy the concept of due process is untenable."

I would conclude that the trial court properly denied mandate in this case, and, accordingly, would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied July 12, 1973. McComb, J., Burke, J., and Clark, J., were of the opinion that the petition should be granted.